NBG3AZAS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          19 Cr. 610 (JGK)

5  AVIRAM AZARI,

6                  Defendant.

7  ------------------------------x    Sentencing

8                                     New York, N.Y.
                                      November 16, 2023
9                                     11:20 a.m.

10
   Before:
11
                        HON. JOHN G. KOELTL,
12
                                       District Judge
13

14                        APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   JULIANA N. MURRAY
17      Assistant United States Attorney

18 MOSES & SINGER
        Attorneys for Defendant
19 BARRY S. ZONE
         -and-
20 JOSEPH ASCH (Telephonic)

21
   ALSO PRESENT:
22 Joel Suberi, Interpreter (Hebrew)
   Shane Crumlish, FBI
23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

NBG3AZAS

1          THE DEPUTY CLERK:  United States of America v. Aviram

2     Azari.  Will all parties please state who they are for the

3     record.

4          MS. MURRAY:  Good morning, your Honor.  Juliana Murray

5     on behalf of the United States.  I'm joined at counsel table by

6     FBI Special Agent Shane Crumlish.

7          MR. ZONE:  Good morning.  Barry Zone for Aviram Azari

8     who sits beside me.  How are you, Judge.

9          THE COURT:  Good morning.

10          THE DEPUTY CLERK:  May the clerk inquire of the

11     defendant, does the defendant have his headphones?

12          THE COURT:  All right.

13          MR. ZONE:  I'm sorry, also present on the line is

14     Joseph Asch, Mr. Azari's Israeli counsel, and I thank the Court

15     for permitting him to appear this way.

16          THE COURT:  Oh, sure.

17          Would the interpreter please note his appearance also.

18          THE INTERPRETER:  Joel J. Suberi, Hebrew interpreter.

19          THE COURT:  Is your oath on file?

20          THE INTERPRETER:  No, I don't think so.

21          THE COURT:  Mr. Fletcher, please swear the

22     interpreter.

23          (Interpreter sworn).

24          THE COURT:  I've received the presentence report,

25     prepared June 14, 2023, revised July 12, 2023.  I've received

NBG3AZAS

| | |
|---|---|
| 1 | the defense submission dated October 12, 2023, and an |
| 2 | additional submission November 15, 2023.  I've received the |
| 3 | government's submission dated October 12, 2023, including |
| 4 | victim impact statements. |
| 5 | A few observations at the outset.  First, I note that |
| 6 | the defendant submitted two expert psychological reports.  I've |
| 7 | read them, of course.  I want to confirm that the defendant is |
| 8 | not arguing that the defendant is not competent to be sentenced |
| 9 | and/or was not competent at the time of the plea. |
| 10 | I don't read the expert reports as suggesting that the |
| 11 | defendant is or was incompetent, but I wanted to confirm that. |
| 12 | MR. ZONE:  Yes, your Honor.  That's not at all what |
| 13 | they were submitted for the purpose of. |
| 14 | THE COURT:  Okay.  Second, I have a preliminary |
| 15 | consent preliminary order of forfeiture in the amount of |
| 16 | $4,844,968, which appears to be signed by Ms. Murray for the |
| 17 | government and by Mr. Azari and Mr. Zone today, November 16.  I |
| 18 | take it the parties agree I can sign that consent order of |
| 19 | forfeiture. |
| 20 | MS. MURRAY:  Yes, your Honor. |
| 21 | MR. ZONE:  Yes, your Honor. |
| 22 | THE COURT:  Okay.  I'll do that in connection with |
| 23 | sentencing. |
| 24 | Next, there is no request for restitution? |
| 25 | MS. MURRAY:  No, your Honor. |

NBG3AZAS

1      THE COURT:  It's correct that there is no request for

2  restitution?

3      MS. MURRAY:  Yes, your Honor.  It is correct that

4  there is no request for restitution.

5      THE COURT:  After reading the submissions, I wish that

6  defense counsel had brought to my attention and sought more

7  help with respect to the defendant's medical condition.

8  Sometimes I'm able to intercede with the Bureau of Prisons to

9  provide more and better assistance to defendants who appear

10  before me, because I take responsibility for defendants who are

11  before me.  And if defense counsel wants help from me now,

12  defense counsel can just bring it to my attention.

13      Finally, in the letter yesterday, the defense asks me

14  for a two-level decrease in the offense level as a result of

15  the current section 4C1.1 guideline, because the defendant has

16  zero criminal history points, and does not fit within any of

17  the exclusions.

18      Government position?

19      MS. MURRAY:  Yes, your Honor.  We agree that the new

20  4C1.1 does apply to the defendant.  So, the new offense level

21  for that group would be 27, rather than 29.

22      THE COURT:  That's right.  Total offense level 27,

23  criminal history category I, guideline sentencing range 70 to

24  87 months, plus 24 months on Count Four consecutive.  So, it

25  becomes 94 to 111 months.

NBG3AZAS

1        And the government should have also brought it to my

2   attention earlier.

3        Okay.  With all of that, I'll listen to defense

4   counsel first.

5        Mr. Zone, have you reviewed the presentence report,

6   the recommendation, and the addendum and discussed them with

7   the defendant?

8             MR. ZONE:  I have, your Honor.

9             THE COURT:  Do you have any objections?

10             MR. ZONE:  I just want to point out a couple of

11   things.

12             THE COURT:  Sure.

13             MR. ZONE:  Your Honor, the first thing I noticed was

14   that and again unless I missed something, you didn't indicate

15   that the report was prepared on 6/14/23 and revised on 7/12/23.

16             THE COURT:  You're right.

17             MR. ZONE:  It was '22.

18             THE COURT:  You're right.  You are absolutely right.

19   The report was prepared June 14, 2022, revised July 12, 2022.

20             MR. ZONE:  So, I wanted to make the record clear.  So,

21   and there was the only thing that that I felt that I wanted to bring

22   to the Court's attention was with respect to the recommendation

23   part of the probation report.

24        And basically, within the probation -- within the

25   recommendation, there is a portion under justification which is

NBG3AZAS

1    document 62, page 21 of 27, third paragraph down, where

2    probation indicates that we recognize the possible existence of

3    several mitigating factors.

4         THE COURT:  I'm on page 21.

5         MR. ZONE:  Page 21, third paragraph down, probably the

6    second sentence.

7         THE COURT:  Under recommendation or under --

8         MR. ZONE:  Under justification, your Honor.

9         MS. MURRAY:  It is page 21 of the filed document, your

10   Honor.  It is page 20 of the report.

11        MR. ZONE:  I'm sorry about that.  I was reading from

12   the file.

13        So they indicate the possible existence of several

14   mitigating factors, specifically physical health, family

15   dependency, and his exposure to war and possible psychological

16   trauma.

17        THE COURT:  The third paragraph under justification

18   that begins "when determining a recommendation"?

19        MR. ZONE:  Yes, your Honor.

20        THE COURT:  Okay.

21        MR. ZONE:  So if you go down it starts "we recognize."

22        THE COURT:  We recognize the possible existence of

23   several mitigating factors, okay.

24        MR. ZONE:  However, to date, we have not independently

25   been able to corroborate any of this information, and as such,

NBG3AZAS

1    we gave no consideration for a variance from the guidelines

2    range.

3         So, and I refer the Court back to the original final

4    presentence report filed July 12, '22, paragraphs 51 and 52.

5         THE COURT:  Yes.

6         MR. ZONE:  It starts off when he first -- when he was

7    first arrested for the instant offense while in custody, he

8    developed an undiagnosed gastrointestinal problem.  And it goes

9    on to say that they observed it during the interview.

10        And 52, it discusses his trying to go have it dealt

11   with by physicians within the prison.

12        So, I just wanted to point out to the Court it wasn't

13   left off the original document.  And they said it's never been

14   verified, because it came from my client's words.

15        And then the second part is with respect to his

16   military.  On page 14, paragraphs 55 and 56, the report

17   indicates that the defendant graduated from military school of

18   the Navy in Israel, and immediately began his mandatory

19   military service.  And then between '89 and '92, going on to

20   paragraph 56, your Honor, between '89 and '92 he was in the

21   Israel Army as an airborne soldier where he received firearms

22   and weapons training.  So, that goes down to describe his

23   military experience.

24        So, just to indicate to the Court that the

25   recommendation that probation indicated is devoid of

NBG3AZAS

1   consideration of his health and military experience.  I wanted

2   to point that out, not such as an objection, but just to point

3   out to the Court that I have reviewed this, I have discussed

4   this with Mr. Azari, and I wanted to point that out to the

5   Court.

6          THE COURT:  Okay.  The presentence report is also

7   wrong in the recommendation because it begins, putting aside

8   the fact that it doesn't include the recent two-level downward

9   adjustment in the offense level, it calculates an offense level

10  to produce a guideline of 87 months to 108 months with two

11  years consecutive.  So that would be a minimum guideline of 111

12  months.  So, probation recommends 111 months, and notes it is a

13  downward variance.

14         MR. ZONE:  I noticed that as well.

15         THE COURT:  That can't be.

16         MR. ZONE:  Right.

17         THE COURT:  The bottom of the guideline sentencing

18  range that the probation department calculated.

19         MR. ZONE:  Yes, your Honor.  There was one other thing

20  I wanted to point out.  I had forwarded to the probation

21  department a net worth statement that was updated a month -- a

22  little over a month ago.  And I sent it to the -- who prepared

23  the report, and her I guess immediate supervisor, and I

24  expected they would include it in an addendum.  But I've been

25  advised that the Court would have to order an addendum or a

NBG3AZAS

1    revised probation report.

2                I provided the information to Ms. Murray, and I have a

3    copy for the Court of his most current financial circumstances.

4    So I wanted to bring that to the Court's attention as well.

5                THE COURT:  If you want me to consider it, and you've

6    given it to the government, you can pass it up.

7                MR. ZONE:  If you want it, I wanted to let you know it

8    was done.

9                THE COURT:  I don't think I need that.

10               MR. ZONE:  Thank you, your Honor.  That's all.

11               THE COURT:  All right.  I'll listen to you for

12   anything you would like to tell me in connection with sentence,

13   any statement you'd like to make, anything at all you'd like to

14   tell me.

15               MR. ZONE:  Okay, your Honor.  Thank you.  Shall I

16   speak from the podium or is it okay if I speak from here?

17               THE COURT:  Whatever is most convenient to you.

18               MR. ZONE:  I'm comfortable right here if that's okay.

19               THE COURT:  That's fine.

20               MR. ZONE:  So, I'll start by saying, Judge, I don't

21   mean to be redundant, I know the Court has reviewed the many,

22   many pages I've submitted, and I will do everything I can not

23   to be redundant.  There are some things that I believe bear

24   emphasizing and I'm going to bring that to the Court's

25   attention.  I also wanted to comment briefly, you have offered

NBG3AZAS

1    in the past to let you know if Mr. Azari was not receiving

2    appropriate medical care.  When we were in court, you ordered

3    that he be taken to the hospital.  Within two weeks he was

4    taken to the hospital, but I'm going to tell you the

5    circumstances.

6            Before he went to the hospital, they put him into a

7    room so they would make sure that nobody would foolishly not

8    give him food for 24 hours.  And this was right after the

9    Court's order to take him to the hospital and give him medical

10   care.

11           And then, from the time they put him in this room that

12   was off the beaten path for the regular rooms and the regular

13   cells, he was left there without food for 58 hours until he

14   passed out and he was taken to the infirmary.  And that was

15   right after the Court's order that he be taken to the hospital.

16           So I can tell you, and again, you've heard this from

17   lots of lawyers.  The fear that we all had -- and I don't blame

18   my client -- the fear we all had is the more we ask the Court

19   to do during COVID times, the more the -- and I can't say all

20   of them, of course, but many of the prison guards would take

21   offense.  And I can tell you, not from Mr. only Mr. Azari's

22   case, these people were punished in a way.  Now, I'm not saying

23   necessarily that specifically this was intentional, but the

24   fear was anything that came from the court to the BOP that

25   created more demands upon the employees at the BOP and the

NBG3AZAS

1  corrections officers, almost always produced a negative result.

2         So the answer is, I've spoken with Ms. Murray, and

3  they have done everything that they can do, I've asked them to

4  get medical records, they've done everything they can to get

5  medical records.  I've told them about everything.  And I

6  really also, you said, look, if you can work it out with the

7  government, then do that.  If you need my help, then let me

8  know.  You've always offered that, and it wasn't my decision

9  not to come to the Court.  It wasn't my decision to just wait

10 and see what happens.  I was in regular contact with

11 Ms. Murray, and there was just, the results were it was COVID,

12 and anything you asked for, you know, you were lucky.

13        So I appreciate what the Court's saying, and I wanted

14 you to understand we weren't just sitting on our hands hoping

15 it went away.  We saw very little result, and he sat at the MCC

16 for two years until they closed the doors.  So, that's really

17 why we didn't involve the Court as much as if it were maybe

18 today that we would have.  That's what my thinking at the time

19 was.

20        THE COURT:  Okay.  I mean, you know, I have gotten

21 defendants hospitalized, I've gotten reports, I know the

22 difficulties of getting defendants hospital treatment.  And I

23 know the restrictions, including the dates have to be

24 confidential and the like.

25        But, I also know that I have been effective in some

NBG3AZAS

1    cases in getting hospital treatment for defendants who need it.

2    So, and I appreciate the wrongful foul-up in terms of the

3    treatment that the defendant received before he went to the

4    hospital.  I appreciate that it was necessary for the defendant

5    not to have eaten because of his condition so that he could be

6    tested at the hospital.  Should that have been limited to 24

7    hours, rather than 58?  Of course.

8            And I also carefully reviewed the other complaints in

9    the way the defendant was treated while incarcerated, also a

10   series of events that should not have happened.  And one thing

11   which I have done in other cases is, and will do here, the

12   defendant lists a series -- unless the defendant tells me not

13   to, the defense in its submission lists a series of treatment

14   abuses that the defendant received while incarcerated.

15           The government should assure that that submission is

16   given to the Bureau of Prisons and that I receive a report

17   within two weeks about what the Bureau of Prisons has done with

18   the complaints of maltreatment of the defendant while he was

19   incarcerated.  Understood?

20           MS. MURRAY:  Yes, your Honor.

21           THE COURT:  And perhaps you have been pursuing that.

22   Defense counsel says you've been very helpful in terms of

23   getting records and the like.  Whether you've passed on the

24   complaints about the actual treatment, I don't know.  I

25   certainly haven't received a report from the Bureau of Prisons

NBG3AZAS

1    as to how this happened and what was done about it.

2             Okay.  Go ahead, Mr. Zone.

3             MR. ZONE:  Thank you, your Honor.  So essentially,

4    your Honor, I'll try to be brief.

5             THE COURT:  I never limit counsel in terms of what you

6    want to tell me.

7             MR. ZONE:  I appreciate that.

8             And so, the question here is what sort of sentence is

9    sufficient, but not greater than necessary.  That's really the

10   question and the tough question you have to answer and decide

11   every time you have one of these.

12            And what this boils down to, your Honor, is a request

13   that he be permitted to serve two-thirds of what the guidelines

14   looks like generally.

15            The case itself, hacking, it's offensive, it's wrong,

16   it's against the law, it's serious.  My client pled guilty, and

17   I would just like to say to the Court that nothing that I'm

18   about to say at all should give the impression that would

19   detract from his acceptance and full acceptance of

20   responsibility for his conduct.

21            Just so the Court understands the context, my client

22   started a private investigative company in '96.  And he did the

23   types of things that as a defense attorney I've hired private

24   investigators to do:  Find witnesses, interview witnesses, look

25   for property, look for assets, surveillance.  And as time went

NBG3AZAS

1    on, and we got into the 2000s, he found people that can assist

2    with penetration tests, to see if companies' firewalls were

3    safe.  Security, cybersecurity.  If you ask my client to do any

4    of that, he couldn't do it.  He's not a sophisticated guy.  He

5    obviously went out and found people to do these services.  What

6    he did was find people in this particular situation, people

7    that were skilled hackers, in India, to assist with the

8    projects --

9              THE COURT:  People who were?

10             MR. ZONE:  Skilled at hacking in India.

11             So he had some of his clients that were the

12   beneficiaries of that service.  And the problem with figuring

13   out the loss amount in this case, your Honor, was that we

14   utilized, what the government and defense perceived to be my

15   client's gain from the offense, which is roughly four and a

16   half million dollars, over the period of the conspiracy or the

17   case, which was from 2014 to 2019.  And that was the loss

18   figure.

19             Now, that figure, bundled into that figure, is also

20   surveillance, searching for property all over the country for

21   clients, ordinary and appropriate investigative tools that my

22   client's company used, obviously packed into the amount of

23   money that he made from providing the hacking services.

24             Further, there were clients that were his clients, his

25   actual clients, that came to him, that he provided these

NBG3AZAS

1    services for.  And then particularly, relative to what's made

2    this case more interesting, he had third parties that would ask

3    for his assistance with his contacts that were the hackers in

4    India, to assist the third parties.  He made zero dollars from

5    the climate change hackings.  He wasn't -- whoever was hired --

6    withdrawn.

7          Whoever it was that was looking for the climate change

8    victims to be hacked wasn't his client.  It was somebody who

9    came to him, a third party, and asked him to assist.  So, the

10   answer is, if you ask my client about climate change, I'm sure

11   he couldn't tell you very much.

12         What's made this case interesting and what's made this

13   case interesting to some of the victims in the courtroom, is

14   that these accounts were hacked, but the people who were the

15   beneficiaries of that hacking, obviously, Exxon, or people

16   related to Exxon, we don't know who they are.  We certainly

17   don't know who they are.  But I can tell you, and this is just

18   my opinion, Exxon is a $40 billion company.  You'd expect that

19   if my client was aware that he was doing some work for Exxon,

20   he'd have made a lot more money over that period of time.

21         So I want the Court to understand.  That doesn't

22   detract or take away from what he did.  He hacked, he did every

23   single thing that he pled guilty to, and the government

24   suggests he was involved in.  I just want the Court to

25   understand from context, he was a guy who was either doing some

NBG3AZAS

hacking for his own clients, when I say "doing hacking,"
sending it to people who he knew would make the attempts or the
hacks or for a third party who would ask him to do this, for
example, this climate change hacking, which is why most of
these people are here.  And I don't minimize the difficulty and
the injury to the victims at all.  And my client could not be
more sorry.

So, your Honor, I know you've heard many cases about
the circumstances at the MCC and the MDC.  But again, this is a
situation where my client got very sick, and in the context of
his incarceration, I wanted to discuss with you the events, if
that's all right.

So the United Nations Convention Against Torture is
basically a convention against torture and other cruel,
inhuman, or degrading treatment or punishment.  And it aims to
prevent torture and other acts of cruel, inhuman or degrading
treatment around the world.

In my opinion, what went on during COVID at the MCC
and MDC was nothing less than torture.  Now, I can't blame
anyone specifically.  It wasn't somebody went in and said we're
going to torture these people.  But, sadly, the circumstances
were such that it's just what happened.

And I will you that my client was in there for every
minute of COVID.  And I just as a lawyer who was trying to
represent a client, and go over discovery and talk about how do

NBG3AZAS

we resolve this case, and how do I get a drive to discuss

evidence with my client into the MCC, which for the most part,

I can only get into -- I'd wait there for hours and be told I

couldn't go in.  I didn't have a translator.  Translators, I'd

call a translator, they'd kind of laugh at me, like that's your

problem.  I spent days figuring out how to get into the MCC.

Ultimately, I got in a handful of times, and when I

got up there, it was 100 degrees.  We had to speak with each

other with a piece of plexiglass up to the ceiling wearing two

masks.  And now, this is a client whose English is, at best,

conversational.  So he could barely hear me, I can barely hear

him.  If I pull my mask down to try and say something, within a

minute, I'd have somebody bang on the door "Put your mask up or

I'm throwing you out."

Everybody was scared.  This was -- I just never

understood or believed that I would experience these conditions

of representation in the context of what I do.

Now the Court gave us great latitude, Ms. Murray's

office gave us great latitude and time to make sure before any

plea was entered, before we made any decisions, that we had a

reasonable and fair opportunity to go through the evidence,

evaluate the evidence, and negotiate and talk about the case.

So, realistically speaking, we ultimately got there.

But the conditions during COVID, to be able to have a

conversation with my client, were unheard of and it was

NBG3AZAS

|    |    |
|----|----|
| 1  | torture.  It was torture for me and it was only three or four |
| 2  | hours that I would try and talk to him.  Then when he would |
| 3  | tell me what was going on, there were rats and bugs and food |
| 4  | was spoiled, they were sleeping on cardboard boxes.  The smell |
| 5  | was -- it was, I did not feel like I was in New York, and I've |
| 6  | been practicing law for over 30 years.  I'm an ex-prosecutor. |
| 7  | And I just couldn't believe what I was seeing. |
| 8  | But at the same time, being what I consider to be |
| 9  | fairly reasonable, I knew there wasn't anyone that was |
| 10 | specifically responsible.  This was the fear that was running |
| 11 | across the country and the world of this deathly murderous |
| 12 | disease.  So, I would say, your Honor that even before COVID, |
| 13 | even before *Booker*, the conditions of confinement at the MCC |
| 14 | have always been criticized. |
| 15 | Specifically, there were limited social programs, |
| 16 | personal development programs, physical training, recreation, |
| 17 | they were locked in with no windows.  There was no reason for |
| 18 | them to -- ability for them to get out and stretch or talk or |
| 19 | socialize. |
| 20 | Even as far back as 2006, Judge Sweet and Judge Wood |
| 21 | reduced sentences based on the horrendous conditions at the |
| 22 | MCC.  So I don't think it is at all a surprise how badly things |
| 23 | devolved at the MCC during COVID. |
| 24 | So, the concept and this concept of a day in prison |
| 25 | under normal circumstances as opposed to a day in prison during |

NBG3AZAS

circumstances at a facility where the conditions are less than

what they should be, that's been kicking around for a long

time.  Even that clients who call me and say I'm in this jail,

they're telling me they're giving me a three for one or a four

for one.  I tell them that's not how it works, and I explain

it.  But I feel like the judges who are doing this calculation

to try and wrap their heads around how to say you may have

committed the worst crime in the world, but we're here to

decide what's the right punishment, how much is enough.

          And I think in this particular situation, what we're

asking for, and that's just with respect to COVID, what we're

asking for is two-thirds, a 60-month sentence, is two-thirds of

what he otherwise would be subjected to.  So, I think that

Judge Oetken said in *Gonzalez*, I do believe that because it's

been harsher than a usual period, it's more punitive, that

essentially the equivalent of either time and time and a half

or two times what ordinarily would be served.

          Judge Failla in *Hatcher* said deprivation of

programming opportunities and mental and physical health

services, when coupled with the extreme lockdown conditions

created by the BOP's response to the pandemic, rose to the

level of extraordinary and compelling reasons to justify the

compassionate release of the defendant in that particular case.

          And Judge Rakoff also essentially says the same thing

in the *Pena* case.

NBG3AZAS

1          So, we've got COVID, and then, six months or so after

2     he's detained, Mr. Azari begins to experience these severe

3     stomach pains.  He goes to the infirmary, they tell him they

4     can't help him.  They've got to take him to a hospital.  COVID

5     hits, and from the time of the first stomach pain that he had,

6     it's not for another year and a half before he gets to a

7     hospital.  And getting to a hospital in normal circumstances,

8     you say, oh, we've made it, we've finished the marathon.  The

9     beginning of his problems were when they took him to the

10    hospital.  Because it seemed to me that the BOP's view was if

11    we got him to the hospital, our obligation is finished.  Not

12    let's make sure whatever the test results in a prescription or

13    some sort of action by some medical personnel to try and repair

14    the problem.

15         This was a game.  Tests were ordered, tests were never

16    received.  I got medical records, and Ms. Murray got me lots of

17    medical records, none of those medical records you can make

18    heads or tails of.  None of the medical records were shared

19    with the doctors that he would be brought to.  So, let's say he

20    went to the hospital in total four times.  Each of those four

21    times, every medical professional said I can't tell you what

22    the situation is, or the problem is, I haven't looked at the

23    medical records.  And then the escort says, well, we don't have

24    those medical records.

25         THE COURT:  Hold on one second.  Go ahead.

21

NBG3AZAS

1           MR. ZONE:  Thank you, your Honor.

2           So this is just a game.  This musical chairs, this is

3    a shell game.  No physician or medical personnel can at all

4    assess what his problem was.

5           So, now his situation, his gastrointestinal situation

6    begins to get worse and worse and worse.  And while that's

7    going on, he's locked in his cell for days.  He lives in filth,

8    without showers, no meals, he's deprived of basic sanitary

9    needs, mattress, a pillow, like I said, your Honor, he's

10   sleeping on rat infested boxes.  It is too hot, it's too cold,

11   and he's got this medical problem.  There's, I mean, I'm not a

12   rocket scientist, but it seems to me that the progression of

13   his illness certainly had to be related to the conditions that

14   he was living in.

15          There came a time where they were letting them out of

16   their cells for a half an hour a day.  So in that half an hour,

17   he had to bathe, and try to speak to his family who's in

18   Israel, seven hours ahead, so he would speak to his family

19   maybe once a month or less if he was lucky.

20          So, he's sick, isolated, nobody to talk to, I couldn't

21   even go to see him, I explained, when I did get lucky to get to

22   see him it was, it was devastating.  And to watch this, and to

23   watch something that I'd never seen in my career, it was -- I

24   would walk out of there heartbroken.

25          And then this burping thing started.  And I couldn't

NBG3AZAS

finish a conversation with him.  Every four to six seconds he's

burping.  I'm trying to understand him, he's trying to

understand me.  He's burping incessantly.  It was very

unpleasant to say the least.

I felt at one point, I'm like looking around, is

somebody like playing some sort of a game, because it's just

how much worse would things continue to get in the context of

trying to represent somebody in connection with a case.  And

this district and the Eastern District have been the best

places in my career to practice.  The most humane place to

practice.  And I just couldn't believe what I was going

through.

Again, there wasn't somebody to blame.  It was just

the circumstances.  It was the fear.  And it makes sense, the

last place where the government is going to try and make sure

people are okay is going to be in a correctional facility.

Because of the nature, and then the people who were working

there that had to work there resented being there.  How do I

know that?  My clients would call me.  There hasn't been a

prison guard in our area for a week.  For a week.  They were

just locked in, huddled together.  People fearing the worst.

And they're watching people die.

So, this is all going on, and I'm not saying anyone

was, you know, had a pleasant experience.  But, I had clients

in jail and it was horrible, and now I have a client in jail

NBG3AZAS

1    who has got medical circumstances that the last thing they are

2    going to worry about is a guy who is burping when people are

3    dying from COVID.  So they resented he would complain.  They

4    resented he would say I can't sleep.

5          Then they would put him in -- he had his bunkmate

6    would have to hear him burping all night.  He would put a

7    pillow over his face.  He'd cry all night.  He would be yelled

8    at, he would be ostracized, he would be spoken to horribly.

9    And his English was, like I said, at best conversational.  So

10   he barely understood what people were saying to him,

11   particularly the prison guards.

12         He explained to me, and I put it in the memo, the

13   animus that the guards that were tasked with taking to him to

14   the hospital acted towards him was horrendous.  He described it

15   as depraving.  They didn't understand his medical condition,

16   which not only became annoying, imagine every few seconds

17   you're burping for years.  For years, in this country.  They

18   hated him, when they saw him, they got away from him.  People

19   in the jail didn't want to associate with him because they knew

20   how the guards felt about him.  So, he was ostracized.

21         The circumstances and I'm just describing them --

22   describing as it was explained to me.  I have to imagine to be

23   that person sitting there for all these years with this, I

24   don't think there are really words to describe it.

25         I'm going to spare the Court from reading from the

NBG3AZAS

1    reports but you've read Dr. Docherty's report.  It's, I mean,

2    there are almost no conditions, they had to come up with new

3    conditions in the DSM to figure out what this is.  This is a

4    new form of war torture.

5         I discussed with the Court the time when he was going

6    to the doctor, the hospital, he was going to go, they said they

7    are going to move you here, and we don't want you to eat

8    because then you are going to not to be able to do the tests,

9    and they forget him.  They forget about him for 58 hours.  58

10   hours.  And I told the government that.  I couldn't -- these

11   are things that I can say, but as I'm saying them, I'm thinking

12   about it and thinking about it.

13        I get it he's here because of his conduct.  What he

14   did wrong.  100 percent.  No question about it.  But, not in

15   this world should this exist.  At first I didn't believe him.

16   What do you mean?  How did they forget about you for 58 hours?

17   Then I hear there's days where multiple guards don't show up to

18   work because they're sick or they don't want to or one person

19   gets sick, they don't come to work.  As long as everything's

20   locked up, it was crazy.  One person got COVID, everybody got

21   locked down for a month.  That's the protocol.  So the protocol

22   was twice whatever the CDC was saying because of how closely

23   these people were living with each other.

24        To this day, your Honor, I'm still without an MRI that

25   was taken seven or eight months ago.  At least we would be able

NBG3AZAS

to find out something about what his condition is.  But I will

say Dr. Docherty evaluated all of the medical records and took

a look at everything and he gave me a picture of what he

believed, based on the diagnosis and review, and his words

were -- and he's at Cornell Medicine.  He appears to be

suffering from achalasia, which is a narrowing of the opening

between the stomach and the esophagus making it difficult for

food to pass to the stomach.  He also has a prepyloric peptic

ulcer, dilated esophagus, gastroesophageal reflux disorder.  He

also has gastric metaplasia, which are precancerous changes to

the gastric mucosa, as well as multiple lesions in his liver,

which are awaiting MRI results for clarification of their

significance.

He cannot sleep or eat regularly given the constant

burping.  He attempts to sleep on his side at a 45-degree

angle, however, if he rolls over, he chokes.  The result is

that he sleeps no more than three to four hours per night.

Such sleeplessness has caused his own adverse health

consequences, from chronic fatigue and inability to exercise.

I can't even imagine how this psychological abuse will

affect this man for the rest of his life.  You want to talk

about specific deterrence?  Specific deterrence?  I don't

think, based on what he went through over the past almost five

years, he would jaywalk.

I know the Court's read the letters from his family.

NBG3AZAS

1    His wife and children.  But like I said, his family is

2    everything to him.  His daughters, his son, he missed his son's

3    bar mitzvah, which, you know, that's what happens when you

4    commit a crime.  You are going to miss a bar mitzvah.  You are

5    going to miss a wedding.  But I can tell you the trauma to this

6    family that he couldn't be there, and the scar that I

7    understood it left on this young boy will be forever.  He'll

8    always remember that my father did not make it to this very

9    important event in his life.  But that's where it starts.

10   Because his daughters are both in the military, and he couldn't

11   be there for them either.

12          And again, nobody's going to say we're sorry you

13   couldn't be there.  They are going to say maybe you think twice

14   before you do something stupid and commit a crime, because

15   that's what I would say.  But, the circumstances in trying to

16   understand this family and these young girls, they are just

17   doing what they're supposed to be doing.  And it's just a very,

18   very difficult time for them.

19          But the fact that he couldn't be there for their

20   military service has a particularized importance here.  And I

21   sat with him and we talked about it.  And even before the war,

22   he cried that he couldn't be there.  And I've never served in

23   the military.  I mean, I know people who have and are.  But I

24   didn't understand, I didn't get the feeling or the meaning when

25   he was so upset, and that's because I didn't have context.

NBG3AZAS

1          And the context was, as I learned more about his

2     military history and his service.  So, particularly, and

3     relating to his psychological conditions, which are fully laid

4     out in the reports and within my memo, in 2006, he and his wife

5     were in New York, and the second Lebanon war broke out, and he

6     said I got to go back.  We got to go.  And he did not have to

7     serve, he was not required to serve.  He could have stayed and

8     he could have -- the demands upon him at that point were not

9     that he had to come back.

10          Within days, he was on the front line at 40 years old,

11     fighting in that war.  And the information I have, and this is

12     why not being there for his daughters is of particular

13     significance, is that he, his battalion fought in Lebanese

14     territory for weeks engaging with enemy soldiers, experiencing

15     close encounters under fire.  And at one point, a tank near

16     where Mr. Azari was hit by a Kornet antitank missile.

17          And then there is a PTSD specialist who gave his

18     report.  And basically, my understanding of what happened,

19     having spoken with my client and having read through the

20     analysis, the paratroopers were near the tank when it exploded.

21     They reached it, and Mr. Azari and the others cleared through

22     dead bodies to try and save the one who was trapped inside, and

23     he worked frantically to try and save the person who was still

24     alive who ultimately died.

25          When he was interviewed by the doctor, I was there and

NBG3AZAS

1    it was in Hebrew, and he wept for 10 minutes.  This is my first

2    real observation of what PTSD is and what it does and how this

3    affects him.

4            And now he's told his daughters are entering the

5    military and he can't be there.  And today, his daughters are

6    involved in the war.

7            His battalion commander in a letter to the Court

8    writes that during the second Lebanon war, Mr. Azari

9    demonstrated exemplary performance in difficult situations and

10   under fire.

11           And after the war, which is of particular importance

12   to what's going on now, helped greatly in supporting and

13   accompanying the bereaved families.  And this is a letter from

14   Joseph Berger who he is obviously still very close with and in

15   touch with.  He's diagnosed with PTSD and major depressive

16   disorder.  And these are just words to me and have been,

17   although I've read and understand generally what they are.  But

18   I'm watching the movie.  I'm watching it happen.  I'm seeing

19   how it's coming out of him.

20           And Mr. Asch, who is with us thankfully on the phone,

21   will discuss some of the issues, because he's discussed that

22   with Mr. Azari that he's going through, not being there for his

23   family during this very difficult time.

24           So, relative to his health, relative to COVID,

25   relative to his military service, again, none of it is an

NBG3AZAS

1   excuse for this crime.  None of it says it's not as bad,

2   because look what I went through.

3        The only reason that I talk to the Court about this

4   and I discuss this with the Court is because the real question

5   and the toughest question for the Court is how much is enough.

6   What's the right amount of time.  And we talk about things like

7   specific and general deterrence, I think if you look at

8   everything in context, I don't think there is a person in the

9   world who knows what somebody suffered through incarcerated

10  during COVID who wouldn't be as scared as a person could be to

11  do anything wrong to commit a crime.  So in terms of deterrence

12  here, I don't see more compelling reasons and weight towards

13  deterrence.

14       Like I said, he has a very, very close relationship

15  with his daughter Danielle who is an officer in the Israeli

16  Army.  She's literally she's in Gaza, and she's got a very,

17  very important position there.  And like I said, Mr. Asch will

18  discuss a little bit more about the current situation and my

19  memo was submitted prior to the conflict, prior to the war.

20  So, I'll let him discusses that with the Court.

21       So, in this particular situation, Mr. Azari has fully

22  accepted responsibility for his foolish decision to become

23  involved in this hacking behavior, and he couldn't be more

24  sorry to the victims.  And I can say the victims are here

25  listening to what he's gone through in the context of his

NBG3AZAS

1   prison term thus far.  And I'm sure that anyone with a heart

2   has to understand this is horrendous treatment.  Flip side is

3   he's only here because of his doing.  And there is no doubt

4   about that, and he's accepted responsibility, and this Court or

5   any court will never see the likes of him again.  I can tell

6   you that.  Because I've spent almost five years getting to know

7   this man, his family, and his circumstances.

8           And I can tell you, Judge, so much he had not

9   complained about to me while it was going on.  And I would say

10  why aren't you telling me this?  And first of all, he really

11  had very little ability to get in touch with me.  But, because

12  he said, what's it going to do.  By me telling you how I'm

13  treated, is that going to change?  Is that going to stop?  I

14  said I can write letters to the Court.  Again, the sentiment

15  from everybody in jail at that time is the more you complain,

16  the more you are abused and the more you were mistreated.  He

17  was at a real disadvantage just because of the language alone.

18  They had no time for him.  They didn't have the patience for a

19  guy who is burping when people are dying from COVID.  So, he

20  lived his own personal hell.

21          He's remorseful for his actions, and he makes no

22  excuse for the actions that brought him to jail and recognizes

23  his conduct is deserving of punishment.  He indicates, your

24  Honor, that he can't emphasize how sorry he is for what he's

25  done.  Unlawful hacking is a severe crime, and he should never

NBG3AZAS

1   have gotten involved in it.  He accepts and understands that

2   for what he did, he deserves to be punished.  He blames himself

3   for these years that he lost, and asks in his letter to the

4   Court to please believe that when he says there is not a day

5   that goes by that he does not regret doing what he did.

6   Nothing justifies the illegal hacking.

7           Your Honor, the requested sentence is really roughly

8   two-thirds of the minimum.  Without COVID, without his illness,

9   without his circumstances and wars, statistically, the courts

10  have viewed first-time offenders a little differently.  And

11  statistically, and I'm not going to bore the Court with

12  statistics, but I am going to say statistically, courts will

13  generally, in a situation where you are dealing with a

14  first-time offender, consider that criminal history is I, and

15  consideration can be given for the fact that under the

16  circumstances something less than a guideline sentence might be

17  appropriate.  Particularly when there's no violence, and the

18  financial loss is on the lower side.  The Court knows all the

19  reasons that throughout the country courts will consider less

20  than a guideline sentence.

21          What I'm asking for here, Judge, is essentially

22  two-thirds of the guidelines.  And most respectfully, and I

23  don't mean to be presumptuous, but I believe something should

24  be considered under his circumstances.  So I feel like it's a

25  fairly conservative request, and again, I don't mean that in a

NBG3AZAS

1    discourteous or presumptuous sort of way.

2            He lived there for five years.  And I just want -- I

3    know I've gone on a while, but I wanted the Court to understand

4    what I've observed, so you have the benefit of why I believe

5    what we are asking for is appropriate.  And I'm very grateful

6    for the Court and the government's time and latitude in

7    permitting me to prepare for this very important day.

8            Thank you, your Honor.

9            THE COURT:  All right.  Thank you.  I know Mr. Asch

10   wanted to speak at sentence, so I'll listen to Mr. Asch.

11           MR. ASCH:  Yes, your Honor thank you.  Can you hear

12   me?

13           THE COURT:  Yes, I can.

14           MR. ASCH:  Okay.  Thank you, your Honor.  I'm not

15   going to repeat obviously anything that said by Mr. Zone.

16           What I do want to do is illuminate a different angle.

17   An angle that I think should be considered during the

18   complicated process of deciding what is the right punishment.

19   And I fully appreciate that reaching the right punishment many

20   times is a necessary task.

21           It is really the war.  I think it would be best to say

22   that the country as a whole is in a collective trauma about

23   what happened to us on October 7.  Hundreds of civilians were

24   murdered in an unimaginable horrific way.  Hundreds of soldiers

25   were killed.  There are 229 people who were kidnapped, many of

NBG3AZAS

1    them are children, and the country is suffering.  And now we

2    are at war.

3            And I can tell you, your Honor, that I wake up every

4    day at 5:30 in the morning, and the first thing I do is I check

5    the news to see how many soldiers died the previous day, since

6    I know many of them.  Israel is a small country.  I've been to

7    five funerals since the beginning of this war.  And I'm not

8    anything special.  There is nothing unique about that.  Most of

9    my friends are the same.

10           And I'm saying this because at times like this, what

11   people need are each other.  With family.  What family members

12   need are each other.  And I can tell you, your Honor, that as a

13   father, and a husband, I find myself time and again speaking to

14   my children, I'm comforting them, trying to explain to them

15   what's going on.  And the same thing with my wife.

16           And I've spoken to Mr. Azari, and the fact that he is

17   not there for his family is absolutely a cause of suffering for

18   him.  As Mr. Zone said, it's right, he brought this upon

19   himself.  But this is something that really is something that

20   goes down deep.  He can't calm his wife, he can't console her

21   or his kids, he can't cheer them up.  He's there in New York

22   and they're here.

23           Mr. Azari's family, they live in a place north of the

24   city of Haifa, which is the northern part of the country.  Your

25   Honor, the whole country is being bombed literally daily with

NBG3AZAS

missiles from the south from Hamas, from the north from the

Hezbollah in Lebanon.  And what that means is that there are

sirens going off all over the country, constantly.

And I can tell you that from, unfortunately, from

experience, hearing a siren go off, it's a horrible sound.  And

having to run to a shelter, and living where they live, they

have a minute and a half to reach a shelter.  Which by the way,

in Israel, is considered a pretty long time.  And running to

the shelter time and again is something that you cannot get

used to.  It causes an anxiety, it causes -- it's frightening,

it is simply horrifically frightening.  And I find myself

speaking to my kids after the sirens just to see that everybody

is okay.  I have a couple of married children and I have a

daughter who is still in the house.  And I hug them and hug my

wife.

And Mr. Azari is not there.  And he told me that this

is such a sense for him, he feels such a failure and he feels

useless.  And it is a sense of helplessness.  And this is

something that is causing him unbelievable also anxiety because

he's worried, and also a sense of deep, deep failure, and

failure that he can't be there with his family.  And he calls

me every once in a while, and I completely understand and can

see that he's in trauma from this.

His daughter Danielle was called up to Reserve, she is

an officer in the Army, and she's not on the front lines, she's

NBG3AZAS

1   not in Gaza, but she's on the outskirts of Gaza.  And your

2   Honor, I was there about two and a half weeks ago for 10 days.

3   I was also called in, even though I'm older.  It is a war zone.

4   Like I said before, when the siren goes off, you have

5   16 seconds to reach a shelter, which is why there are shelters

6   all over the place.  But it is frightening.

7        And again, he's not there.  And like Mr. Zone says,

8   this is a person who was in a war, he has PTSD from that war.

9   He experienced very hard experiences during that war.  But he

10  is somebody who, is this is a guy who really can explain what's

11  going on and what should be happening to console them and cheer

12  them up.  And he's sitting jail in Brooklyn, and it's killing

13  him.  And it's killing him.

14        I think one of the main parts that he'll never forgive

15  himself, your Honor, is not being there for his sister.  His

16  sister who is very close to him.  Her son was killed I think

17  the first or second day of the war.  I know this has literally

18  crushed him.  I spoke to his wife.  I didn't want to be the one

19  to tell -- to break the news.  His wife called and told me

20  about this, and she told me when she told him on the phone what

21  happened, he literally broke down and started to yell.  And

22  this is something that, again, he's not there for his family.

23  His wife is a wreck.  She has other nephews and they all have

24  other family members who are engaged in this war.  There are

25  nieces, there are nephews.  I speak to his mother every once in

NBG3AZAS

1    a while, just to see that she's okay.  She lost her grandson,

2    Mr. Azari's nephew.  His parents are a wreck.

3            He's going to have a lot of pieces to put back

4    together when he comes home.  And I hope that he does have a

5    home to go back to.  I know that his children support him and

6    they miss him very much.  Very very important to them.  And I

7    know that at the end of the day, his wife is there for him

8    also, even though she had much difficulty without him.

9            So, like I said at the beginning, I think, I

10   completely trust your Honor to reach the right and just

11   punishment, and I think that these circumstances that are new

12   and none of us could have anticipated, I think that they also

13   should be taken into consideration.  The fact that he's away

14   from his family is a sort of punishment in itself.

15           And also one last thing, your Honor.  His family

16   members, his wife and his parents, asked me again to express

17   that they apologize for not being in court.  They obviously

18   wanted to be there and support him and hug him.  But the

19   circumstances simply could not allow it, which is also why I

20   couldn't be there either.  So that's basically all I wanted to

21   add.

22           THE COURT:  All right.  Thank you, Mr. Asch.

23           Mr. Azari, have you reviewed the presentence report,

24   the recommendation, and the addendum and discussed them with

25   your lawyer?

NBG3AZAS

1          THE DEFENDANT:  Yes.

2          THE COURT:  Other than your lawyer has already said,

3  do you have any objections to the presentence report?

4          THE DEFENDANT:  No.

5          THE COURT:  I'll listen to anything you would want to

6  tell me in connection with sentence, any statement you'd like

7  to make anything, at all you'd like to tell me.

8          MR. ZONE:  Your Honor, may he sit down?

9          THE COURT:  Sure.

10          THE DEFENDANT:  I will try the first two items --

11          THE COURT:  Could you speak into the microphone.

12          THE DEFENDANT:  I will try the first two items and

13  then I will ask the attorney to continue.

14          THE COURT:  Could the interpreter speak into the

15  microphone, please.

16          THE DEFENDANT:  I will try the first two items, and

17  then I will --

18          THE COURT:  There is a microphone on the table.

19          THE DEFENDANT:  I will try the first two items and

20  then I will ask the attorney to continue.

21          THE COURT:  Okay.

22          THE DEFENDANT:  Your Honor, your Honor, on this case,

23  and honored guests and people present, it is my wish to express

24  my deep regret on offenses that I had done.  I take full

25  responsibility on the errors and I respect the honorable

NBG3AZAS

1   decision that the Court will do with me -- the just punishment

2   that the Court will do with me.

3        I deeply regret before all of the victims and hope

4   that they will be convinced of the seriousness of my regret.  I

5   will not return and repeat my actions, and I will serve as an

6   example to those that will come after me and have an idea to

7   violate the law.

8        Your Honor, and dear Americans, about a month ago, the

9   State of Israel had suffered the most serious offense in the

10  history of our 75 years of independence.  Slaughter of 1400

11  women, men and children.  240 civilians were kidnapped to the

12  tunnels of Hamas that are on the strip of Gaza.  And they're

13  held there as hostages.

14        My country is in war.  The United States of America,

15  our greatest friend and real friend, supports us in our common

16  enemy -- in our fight against the common enemy, the common

17  enemy to democracy, the terrorists.

18        My nephew, the son of my sister, Yaron Zohar, a

19  soldier, 19 years old, was killed in the Hamas attack on the

20  7th of October, on the first day of the war.  Yaron defended

21  with his own body on the fences of the kibbutz and on the Gaza

22  strip.  In his death, he kept the Hamas terrorists from

23  entering the kibbutz and to murder its people.

24        The daughter of a good friend of mine, Danielle

25  Frankel, was murdered in the music festival on the 7th of

NBG3AZAS

1   October, 22 years old.  During the week, her family did not

2   know, we did not know, if she was murdered or taken as a

3   hostage.  It became clear that her body was burned to its core.

4        My friend had buried in the grave only her teeth in

5   the attack of the 7th of October.

6        My daughter Danielle, was on a trip in Thailand.

7   Within 24 hours, she returned quickly to Israel, and enlisted

8   for a battle service in the Army, and she serves today on the

9   front lines in the Gaza Strip.

10        The hills in Israel are sponging missile attacks from

11   the south, from the north, and from the east.  You hear sirens

12   in all of the cities, and my family members go a few times a

13   day into the shelters.  During the evenings, they sleep in the

14   secure room.

15        The shock and the surprise, the pain, the suffering

16   that I am feeling, they are the worst I have felt in my life,

17   more than when I was a soldier at war.  I am worried for the

18   life of my family members and my dear friends that are in the

19   back lines.  I am worried for the life of my daughter, and the

20   rest of all of our children, our soldiers that are on the front

21   lines in the war.  I cannot support them in this difficult hour

22   of ours.

23        The pressure and my suspicion to receive a bad

24   notification from Israel regarding the war when I am not near

25   them, it turns my stomach.

NBG3AZAS

1           Your Honor, I made a mistake.  I take responsibility.

2    Full responsibility for my actions.  I regret with all of my

3    heart before all of the dear victims, I will never repeat this

4    ever again, and I will serve as an example for a proper, proper

5    and legal behavior.  I accept any punishment that the justice

6    system in America will put upon me.

7           With understanding and with respect.  Thank you,

8    Aviram Azari.

9           THE COURT:  Thank you, Mr. Azari.

10          Ms. Murray, has the government reviewed the

11   presentence report, the recommendation, and the addendum?

12          MS. MURRAY:  Yes, your Honor.

13          THE COURT:  Does the government have any objections

14   except as already noted?

15          MS. MURRAY:  No, your Honor.

16          THE COURT:  I'll listen to you for anything you would

17   like to tell me in connection with sentence, any statement

18   you'd like to make.  Also, if there are any victims here who

19   wish to be heard, you can let me know about that too, and they

20   can either speak before or after you.

21          MS. MURRAY:  Yes, your Honor.  There are three victims

22   here who would like to be heard.

23          THE COURT:  All right.

24          MS. MURRAY:  I think I will make my presentation

25   first, and then I'll permit the victims to speak.

NBG3AZAS

1    　　　　We do acknowledge all of the 3553 factors that

2    Mr. Zone and Mr. Asch and the defendant have raised.  We

3    certainly think that those are appropriate considerations for

4    your Honor to consider, including the conditions of Mr. Azari's

5    incarceration.  I would like to focus on the other 3553(a)

6    factors in my statements to the Court.

7    　　　　As an initial matter, regarding the money that

8    Mr. Azari made from this hacking scheme, approximately $4.8

9    million, I just wanted to clarify, that full amount represents

10   his illegal work.  His hacking work.  That amount was derived

11   by looking at invoices that Mr. Azari had submitted for money

12   he had gotten for the particular clients who hired him to do

13   illegal hacking work.

14   　　　　And I would note that some of those invoices and some

15   of that money did come from the clients who hired Mr. Azari to

16   target who we're referring to as the climate change victims.

17   So that's just an initial matter.

18   　　　　The primary considerations that the government wants

19   to put before the Court here with respect to Mr. Azari's

20   sentencing are the seriousness of the offense, the need for

21   general deterrence, and the need to avoid unwarranted

22   sentencing disparities among similarly situated defendants.

23   　　　　So first, with respect to the seriousness of the

24   offense, Mr. Azari was an essential link in the chain of what

25   was a sophisticated and long-running global hacking scheme.  We

NBG3AZAS

1    highlighted several specific projects in our written submission

2    that Mr. Azari had worked on of more than 40, at least that the

3    government is aware of, over the time period of the charged

4    conspiracy.

5         And I would note that each of those projects involved

6    the hacking or the targeting of 100 or more different victims.

7    So the true scale of this crime is exponentially larger than

8    the government has been able to confirm.  There are thousands

9    of victims of this hacking scheme across the globe.

10        The hacking includes the theft of victims' personal

11   and professional data, and then the unauthorized use of that

12   data, including often times to negatively impact or obstruct

13   these victims' own work or their own lives.

14        Once the hackers stole the victims' credentials,

15   including user names and passwords, they used those credentials

16   to illegally access other victim accounts, and also to target

17   connections or people associated with victims whom they had

18   successfully hacked.

19        And Mr. Azari made millions of dollars from his role

20   managing and overseeing the hackers.  Mr. Azari's hacking

21   campaign has had a devastating and a lasting impact on the

22   victims.  These were not indiscriminate targets.  The hacking

23   victims who were targeted for each of Azari's projects were

24   carefully chosen by Mr. Azari's clients, and in turn by

25   Mr. Azari when he passed those names along to the individual

NBG3AZAS

1   hackers.  And they were chosen with the particular goal of

2   disrupting or undermining specific public interest groups or

3   causes or other work, including, for example, climate change

4   advocacy, or reporting or short positions on fraud that was

5   occurring at the German payment processing company Wirecard.

6           As we've laid out in our submission to the Court, and

7   your Honor has seen in the victim impact statements and I

8   expect will hear from victims today, the victims had suffered

9   very real harm from this hacking campaign and Mr. Azari's

10  crimes.  And that includes not only financial and reputational

11  harm, but also emotional and physical harm as a result of the

12  torment that they feel from the intrusive nature of these

13  crimes, the personal nature of these crimes, and their

14  inability to feel safe or secure even in their own personal

15  accounts and matters.

16          With respect to general deterrence, investigations of

17  sophisticated hacking cases like this are extraordinarily

18  difficult.  As your Honor can see, in this case alone, there

19  are layers and layers of hackers or different actors who were

20  involved with the hacking.  They used advanced methods to

21  conceal their locations and their true identities.  They're

22  situated across the globe.  They communicate using accounts

23  that are not in their own names through methods that are very

24  hard to trace back or to detect.  And even when law enforcement

25  is able to identify the hackers or the people who are

NBG3AZAS

1    associated with the hacking activity, it's very difficult to

2    bring them to justice in a U.S. court.

3          Cases like this also require significant law

4    enforcement resources to investigate and bring to prosecution,

5    as we have here.

6          So for those reasons, Mr. Azari's sentence should send

7    a message to other hackers in the U.S. and abroad about the

8    serious consequences of their crimes.

9          And finally, your Honor, on the need to avoid

10   unwarranted sentencing disparities among similarly situated

11   defendants, we've cited several examples of similarly situated

12   defendants in hacking cases and intrusion cases and aggravated

13   identity theft cases in our sentencing submission.  And we

14   would just note for your Honor that the significant

15   incarceratory sentences for defendants who have operated

16   sophisticated and extensive hacking campaigns like this one,

17   similarly warrant a substantial sentence here.

18         So for those reasons, it is the government's position

19   that a substantial sentence of incarceration within the

20   guidelines range of 94 to 111 months is appropriate here.

21         With respect to the victims who wish to be heard, your

22   Honor, their names are Daniel Feldman, Lee Wasserman, and Peter

23   Frumhoff.  I'm happy to answer any questions the Court may

24   have.

25         THE COURT:  No.  I'm prepared to listen to the

NBG3AZAS

1    victims.  So the first victim?

2              MS. MURRAY:  Perhaps Mr. Feldman can go first.

3              MR. FELDMAN:  Good afternoon.  My name is Daniel

4    Feldman.  I'm a resident of New York City, although I'm

5    originally from Boston.  I am a former senior enforcement

6    attorney with the SEC, so I spent time looking at financial

7    crimes, that often people thought weren't as serious as others

8    did.

9              Thank you for allowing me to speak today at the

10   sentencing hearing for Aviram Azari.  Learning about the extent

11   of Aviram's crimes against me has been a difficult time.  I was

12   involved in a David versus Goliath business litigation.  I'm

13   not part of the climate hacks that people talk about.

14             This was very personal to me, where a group ultimately

15   controlled by Russian oligarchs living in Israel made eight

16   claims against me in this court, here in this courthouse, and

17   sued me for over $10 million, including asking for my entire

18   salary back for over 10 years.  They claimed that I was an

19   unfaithful servant, but I was not.

20             I put up a spirited defense, but it was hard to do so

21   against a group of billions of dollars at their disposal,

22   especially when Aviram gave them full access to all

23   communications with my lawyers throughout the entire four years

24   of litigation.

25             I knew what the truth was, and worked hard to make

NBG3AZAS

1    sure the jury got the full picture.  The litigation took four

2    years, with a ton of depositions, and ultimately a three-week

3    trial here before Judge Kaplan in this building.

4           I was struck throughout the process on how prescient

5    the other side seemed to be.  They were prepared with neatly

6    packaged lies for all our inquiries and explanations.  I sensed

7    something was off and grew increasingly frustrated.

8           I went from someone who slept well to nightly

9    struggling to fall asleep to having crazy scary nightmares to

10   having a quick temper with my family and friends.

11          I wanted to say some things to Aviram in Hebrew.  I

12   don't know it's so appropriate right now to do so.  My wife is

13   Israeli.

14          THE COURT:  We have an interpreter.

15          MR. FELDMAN:  (Speaking through the interpreter) Good

16   morning, Aviram, how are you.  Is everything all right?

17          (In English)  It isn't okay with me.  This isn't the

18   first time, despite what people are saying in this courtroom,

19   that he's been convicted of a crime.  In Israel he was

20   convicted of crimes.  And I am sure that this conviction,

21   despite what his lawyers say, won't be the last.

22          How sad it must be for you and your family to have

23   once been a proud member of the Israeli military and then a

24   police officer, and now you're here.  You should be in Israel

25   helping during this great time of need.

NBG3AZAS

1          Last summer I hosted five soldiers, Israeli soldiers

2     at my home who had recently finished their service.  They grew

3     very close to my family.  One was my cousin's son.  They've all

4     been called back now to service, and we're terrified for them.

5          On Tuesday, I took my whole family down to Washington,

6     D.C., and we participated in a demonstration with 290,000 other

7     people in support of Israel.  We demanded the release of the

8     hostages.  While none of them are named Aviram, there is an

9     Amiram, an Aviva, an Aviv, an Avinatan, and an Avraham.

10          I don't think it's so appropriate here to be

11     leveraging the war in Israel in asking for him to be treated

12     more kindly.  While I hope his daughter is safe, and I will

13     pray for her, it wasn't clear whether one lawyer said she

14     wasn't on the front lines, another lawyer says she was.  It

15     doesn't matter.  She's serving in the military and my heart is

16     with her.

17          I know people like you.  I don't think you think you

18     did anything wrong.  You think you are the victim.  You hear

19     what I say and I think you think to yourself that I'm the weak

20     one.  But you will never understand this.  But you are the weak

21     one.  You think taking shortcuts in life is the way to go, and

22     the rest of the world is doing it wrong.  You think that I'm

23     weak because your crimes had such an effect on me.  But

24     actually I'm strong.  I stood tall against nearly

25     insurmountable odds against the scariest people.  The people

NBG3AZAS

1   who sued me have been convicted of five murders, and yet I

2   stand here not afraid to speak up.

3        If you're truly sorry, you should be giving the names

4   of the people who hired you.  If you are truly repentant, help

5   us get the people who came after me.  I continue to fight

6   against those who hired you.  I know who they are.  As I said,

7   one has been convicted of organizing five murders of those who

8   opposed him in business disputes like I did.  Yet I'm not

9   hiding and running in fear.

10        Your weakness will continue throughout your life, and

11   you'll make excuses for your acts.  I wonder whether deep down

12   you are even truthful with yourself.  Your crimes, both those

13   for which you are being sentenced to today, and those which

14   you've been previously convicted of, show you are incapable of

15   feeling empathy.

16        I would love for you to do the right thing and prove

17   me wrong, but I hold out no hope for that.

18        I want to thank the Reuters news agency for reaching

19   out to me.  But for their investigative work, I would never

20   have known that I was a victim of these crimes.  It answered a

21   lot of questions.

22        My financial losses have been massive.  It has

23   destroyed my career.

24        I want to thank the FBI and the U.S. attorney's office

25   for their excellent work in exposing and at least stopping

NBG3AZAS

1    Aviram's crimes for a period of time.  Thank you, Agent

2    Crumlish.  Thank you, AUSA Murray.  I am forever grateful.  You

3    have no idea how healing this process has been for me and my

4    family.

5         While I'm still dealing with Aviram's co-conspirators

6    or clients who have not yet been caught, I'm coming back.  I'll

7    be stronger than ever.  I wake up every day thankful to not be

8    someone like Aviram.  Thank you, your Honor.

9         THE COURT:  All right.  Ms. Murray, who is the second?

10        MS. MURRAY:  Peter Frumhoff will be the next victim,

11   your Honor.

12        MR. FRUMHOFF:  Thank you, your Honor.  I appreciate

13   the opportunity to speak today.

14        My name is Peter Frumhoff.  I am a climate scientist.

15   I teach climate science and public policy at Harvard

16   University, and I'm also the senior science and policy advisor

17   at the Woodwell Climate Research Center, a nonprofit based in

18   Woods Hole, Massachusetts.

19        For many years, until through 2021, I was the director

20   of science and policy and chief climate scientist at the Union

21   of Concerned Scientists, a nonprofit based in Cambridge,

22   Massachusetts.  In that capacity, I guided and led our climate

23   accountability campaign, which was a collaborate with

24   colleagues in the scientific community to engage policy makers

25   in the media with a rich understanding, a documentation of the

NBG3AZAS

actions that major fossil fuel companies were taking and

continued to take to sow doubt and disinformation about climate

science and its impacts in order to limit regulation on fossil

fuels, their primary products and source of their profits.

Between 2015 and 2018, for example, I and scientific

colleagues published multiple peer reviewed papers that

documented climate disinformation by Exxon Mobil and other

fossil fuel companies.  We also documented just how much of the

rise in global average temperature in sea level and other

changes in climate could be traced back to the emissions from

the products of these individual fossil fuel companies.

During the 2017 to 2018 time frame, I was among the

victims of a major cyber attack that targeted me, and as we've

now come to learn, a number of colleagues in other climate

advocacy nonprofit organizations working to hold these

companies accountable for their role in deceiving the public

about the scientific evidence of climate change.

The elaborate spear-phishing campaign sent repeated

deceptive e-mails to me that indicated a sophisticated

understanding of my interests and context.

This criminal effort eventually managed to break

through into my work e-mail account, causing me a great deal of

stress.  I had no idea what personal and professional

information had been compromised.  It was unnerving.

We now know that the cyber attack was part of a

NBG3AZAS

1    concerted criminal assault on my rights, and those of my

2    colleagues, to engage in the public interest in this vitally

3    important work of climate accountability.

4            We now know that Mr. Azari played a central role in

5    executing this hacking campaign on the part of his client or

6    clients who have yet to be named.  As an espionage effort, it

7    may have afforded Mr. Azari and his clients with important

8    information about my and my colleagues' work.  It also had an

9    inevitable and completely detrimental chilling effect on our

10   work.  As we became aware of this intrusion, it forced me at a

11   critical moment to become extremely wary about which e-mails to

12   me were legitimate and which were not.  I had no idea what

13   information had been compromised.

14           Now, it's important to note that during this 2017 to

15   2018 time frame, a great deal of pressure was being brought to

16   bear on specific fossil fuel companies, including Exxon Mobil,

17   for example, in October of 2018, the New York attorney general

18   brought charges against the company alleging that it had

19   deceived its shareholders about the realities of climate

20   change.  Many other states attorneys general across the country

21   were considering bringing lawsuits as well.  And as an expert

22   on this topic, I was in contact with several of them.

23           It was at this vital time in our campaign that cyber

24   attacks against me and my climate advocacy colleagues occurred.

25           Now, I and my colleagues were clearly the direct

NBG3AZAS

1    targets of this hacking campaign managed by Mr. Azari.  But

2    recognize that this campaign was serving a broader purpose.  It

3    seems obvious to me, at least, that the purpose was to

4    constrain climate action.  That it was being fostered by

5    recognizing the devious and disinformation actions of major

6    fossil fuel companies.

7         So in a very real sense, while I and my colleagues

8    were targets, everybody were the intended victims.  Right.

9    Climate change affects all of us.  The climate crisis affects

10   all of us.  So I was a target, but the public at large were the

11   intended victims.

12        I want Mr. Azari to know just how harmful these

13   attacks were to me personally, but most importantly, how

14   harmful they were to the broader challenge of addressing the

15   climate crisis.  We have a right to know who the clients were.

16   The public has a right to know who was paying Mr. Azari to

17   carry out these attacks.  I hope that that essential

18   information will soon come to light.  Thank you very much.

19        THE COURT:  All right.  The third victim witness.

20        MS. MURRAY:  Yes, your Honor.  That would be Lee

21   Wasserman.

22        MR. WASSERMAN:  Thank you.

23        Your Honor, I have had the privilege to direct the

24   Rockefeller Family Fund for nearly 25 years.  The Family Fund

25   is a public charity that develops and implements programs to

NBG3AZAS

protect our democracy, advance economic justice for women, and
most relevant to this proceeding, mitigate the climate crisis.

As someone who grew up in a lower income community in
Schenectady, New York, I am thankful every day that the
Rockefeller family has allowed me to develop programs and
allocate resources to help make the world a better place.

Let me start with the observation that for my own
experience, I can emphatically say this was not a victimless
crime.  I would like to provide some context about my and my
colleagues' involvement in this matter and the implications of
us being targeted by the defendant in this way.

In 2013, I met with the then new dean of the Columbia
Journalism School, Steven Coll, who had just written a book
about Exxon, Private Empire.  I suggested to him that if he
thought it a good idea, the Family Fund would help support an
investigative journalism project to better understand what
fossil fuel companies knew about climate science, when they
knew about it, and what they did with their knowledge.  His
interest in similar questions had been piqued when he was
researching his book and he readily agreed to undertake the
initiative.

The journalists from Columbia uncovered scores of
internal Exxon documents that made it clear that Exxon
understood, at least since the 1980s, how fossil fuels, used as
intended, could, as one of the memos said, quote, indeed be

NBG3AZAS

1  catastrophic, at least for a substantial fraction of the

2  world's population.  Several other memos rang the climate alarm

3  bell as urgently.

4       When the existence of these internal documents was

5  reported, the company accused advocates of cherrypicking the

6  memos.  Quote:  Read the documents, the company said, and make

7  up your own mind, closed quote.

8       Not only did I read the documents, your Honor, but I

9  asked two scholars at Harvard to do so also.  Their peer

10  reviewed analysis concluded that based on these memos and other

11  internal and public pronouncements Exxon had made about climate

12  change, 187 documents in total, the company had, quote, misled

13  the public about the state of climate science and its

14  implications, closed quote.

15       As we believed at the time and now has been alleged,

16  in complaints file by nine state attorneys general, despite

17  this near certainty that their business would likely cause a

18  crisis for humanity, Exxon and others engaged in a multi-decade

19  effort to confuse the public about climate science.

20       Your Honor, this struck us as a very big deal.  We

21  believe that if enough citizens paid attention to what had been

22  reported, it would help clear up the ongoing confusion many

23  still harbor about whether climate change is happening, what is

24  causing climate change, and its deadly consequences we now

25  regularly and tragically witness in communities around the

NBG3AZAS

1    globe.

2              As advocates typically do, we had meetings to plan how

3    to communicate the details of this outrageous conduct to the

4    public and to public officials, conduct which I view as the

5    most consequential corporate deception of all time.

6              After one of the meetings held at the Rockefeller

7    Family Fund's offices in New York, in January of 2016, I was

8    surprised to receive a call from a reporter who had been given

9    a private e-mail sent out to participants by the meeting

10   organizer.  When the reporter's paper, the Wall Street Journal,

11   failed to print the actual e-mail in a story that mentioned our

12   meeting, the e-mail appeared the very next day in another

13   paper, the Washington Free Beacon.

14             It wasn't until early in 2018 that I began to

15   understand how this e-mail apparently ended up in the hands of

16   media outlets.  It came to my attention that I was high up on

17   the list of people who were repeatedly spearphished by a

18   hacking operation based in India.  The phishing e-mails often

19   pretended to be from people I knew, including people from my

20   own staff.  Some suggested that there were important news or

21   documents about Exxon I had to immediately view on a Dropbox

22   link.  Some suggested there were legal documents from lawyers

23   working on an Exxon case that I should review.

24             But it wasn't only me who was targeted.  It was nearly

25   every one of my colleagues who attended that January 2016

NBG3AZAS

meeting.  It was other colleagues who didn't attend that
meeting.  It was children of colleagues.  It was friends of
public officials we had spoken with.  It was my family.
Researchers from the University of Toronto's Citizens Lab
graphed the number of hacking attempts directed towards me and
my colleagues and noted the hacking spiked involving major
events involving Exxon.

After the advocates met at the Family Fund's offices,
the hacking attempts went up.  When the New York attorney
general announced his conclusions about alleged fraud, the
hacking attempts went up.  Just before New York City announced
its lawsuit against Exxon and other companies, the hacking
attempts went up.

When I learned all this, I was appalled and shaken.
It felt like Big Brother had arrived and we had taken a step
toward a society where citizens opposing powerful interests
have their communications surveilled, their internal documents
opened to furtive review, and in this case, their work and
motives attacked directly by Exxon, and those actors and
institutions sympathetic to and sometimes funded by the fossil
fuel industry.

I did not know if the hacking attempts had succeeded.
Was everything on my computer now in the hands of God knows who
with the intent to use every word I have ever wrote in some
distorted way?

NBG3AZAS

1           Knowing I was under this kind of electronic

2      surveillance, your Honor, how could I communicate with my

3      staff, my family, my friends.  I found myself whispering in my

4      own home.  My daughter, then a recent college grad, had been

5      electronically stalked in one of her social media posts,

6      cheering on her dad's efforts had appeared in a range of social

7      media and in a complaint drafted on behalf of Exxon.  Was she

8      now at risk?  Was the rest of my family at risk?  These were

9      the questions I carried with me.

10          I know this kind of thing happens all the time in

11     other countries where free association and speech and

12     opposition to powerful interests must be done surreptitiously

13     at risk to one's freedom and even life.  I never, frankly,

14     thought I and my colleagues and family would be victim to this

15     kind of intrusion into my professional and personal life here

16     in the United States, simply because I was working to better

17     understand and address the climate controversy which Exxon's

18     internal memos suggested 40 years ago was likely, and which is

19     now threatening us and our children.

20          The defendant, your Honor, was not independently

21     following and targeting climate advocates in the U.S. from

22     halfway around the world.  He was of course not the person to

23     decide I needed to be hacked and my privacy violated.  The

24     defendant is an actor in a bigger play.

25          As the U.S. attorney has stated in court documents, he

NBG3AZAS

1    was working with U.S. companies as part of this operation.  I

2    hope the U.S. attorney's office is on its way to determining

3    the defendant's accomplices.  The defendant violated U.S. law

4    certainly to make a buck.  But the harm he and those he worked

5    with have done is incalculable.

6            I want to say as clearly as I can that I don't know

7    who besides the defendant is responsible for this crime.  I do

8    feel compelled to note, however, your Honor, that I do know who

9    has repeatedly used the fruits of the crime.  I believe it is

10   important to say, because it underscores in a concrete way why

11   the defendant's actions have been and continue to be harmful.

12   For years, Exxon's corporate website had references to and

13   quotes from the e-mail about our private meeting and other

14   related material that was apparently illegally obtained.  The

15   material was only removed from the company's website this past

16   April, just after the Wall Street Journal published an exposé

17   on this matter with the headline, quote, Exxon's Climate

18   Opponents Were Infiltrated by an Apparent Hack for Hire

19   Operation.  The companies used the e-mails to develop a

20   convoluted and utterly false story about how citizens working

21   together to address climate change are somehow conspirators

22   seeking to deny Exxon its constitutional rights.  A fairytale

23   meant to deflect attention from the damning internal documents

24   that the journalists uncovered and the lawsuits that documents

25   catalyzed.

NBG3AZAS

1     Your Honor, it's our job to tell the truth about a

2   world on fire and to point out those responsible for lighting

3   the flame.  Thank you for taking into consideration the harm

4   the defendant and those he has worked with have done to chill

5   and interfere with our rights as free people to work together

6   to petition public officials, and to do our best to address the

7   profound climate threat the world now faces.  Thank you.

8     THE COURT:  I'll place the presentence report, the

9   recommendation, and the addendum is in the record under seal.

10  I'll place the parties' submissions to the court in the record

11  under seal.  The parties should place their submissions in the

12  record not under seal, after removing any personal identifying

13  information.

14     I adopt the findings of fact in the presentence

15  report, except I've already noted that there should be a

16  two-level decrease in the offense level under 4C1.1.  So that

17  the offense level is 27, the criminal history category is I,

18  and the guideline sentencing range is 70 to 87 months, to be

19  followed by 24 months consecutive on Count Four, so that the

20  guideline sentencing range is 94 to 111 months.

21     I appreciate that the guidelines are only advisory and

22  that the Court must consider the various sentencing factors in

23  18 U.S.C. Section 3553(a), and impose a sentence that is

24  sufficient, but no greater than necessary, to comply with the

25  purposes set forth in Section 3553(a)(2).

NBG3AZAS

1          The offense is very serious.  The defendant was

2    responsible for arranging the hacking of thousands of

3    individuals and entities.  The hacking had a devastating impact

4    on individuals and entities.  It resulted in personal grief and

5    anxiety for individuals.

6          As a result, the defendant was paid $4.8 million over

7    nearly five years, which was in turn paid, at least a portion,

8    to those who actually did the hacking.

9          There are substantial mitigating factors.  The

10   defendant has been incarcerated at the MCC and the MDC for over

11   four years.  The conditions at those institutions have been

12   deplorable, including particularly severe conditions during the

13   COVID epidemic.

14         In addition, the defendant has suffered from

15   gastrointestinal problems, which have not been adequately

16   attended to while the defendant was incarcerated.

17         The defendant should receive credit for the unusually

18   harsh conditions of confinement, so that the time spent is not

19   adequately represented by simply the years spent in

20   confinement.

21         The defendant should also receive credit for his

22   substantial public service while a member of the Israeli

23   military, and his service as a police officer.  That service

24   resulted in PTSD, and a major depressive disorder.  All of that

25   is independent of the current conditions in Israel.  The

NBG3AZAS

1    defendant also has a record of service to others.

2         So, it is left to the Court to balance those factors

3    and arrive at a sentence that is sufficient, but no greater

4    than necessary, to meet goals of sentencing in Section

5    3553(a)(2).

6         The defense suggests a sentence of 60 months.  Some of

7    the victim impact letters suggest a maximum sentence.  The

8    probation department suggests a sentence of 111 months, which

9    the probation department incorrectly states is a downward

10   variance.  And in any event, is based upon a guideline

11   calculation which is wrong, because it fails to take into

12   account the two-level offense reduction under the current

13   guidelines.  The government urges a sentence within the current

14   guideline sentencing range.

15        On balance, in this case, the Court intends to impose

16   a sentence of 56 months on Counts One and Three, to run

17   concurrently, to be followed by a mandatory minimum consecutive

18   sentence of 24 months on Count Four, for a total sentence of 80

19   months, to be followed by a three year term of supervised

20   release on Counts One and Three, and a one year term of

21   supervised release on Count Four, all to run concurrently.

22   With the mandatory, standard and special conditions of

23   supervised release listed on pages 21-23 of the presentence

24   report.

25        I will not impose drug testing because the defendant

NBG3AZAS

1   is a low risk of substance abuse.  I will not impose a fine

2   because the defendant lacks the ability to pay a fine after

3   taking into account the presentence report.  No restitution is

4   sought.  I have signed the order of forfeiture in the amount of

5   $4,844,968.

6           The Court will impose a $300 special assessment.

7           The sentence is consistent with the factors in Section

8   3553(a) and is sufficient, but no greater than necessary, to

9   comply with the purposes of Section 3553(a)(2).

10          I've explained the reasons for the sentence.  Before I

11  actually impose the sentence, Mr. Zone, I'll recognize you for

12  anything you wish to tell me.

13          MR. ZONE:  Just to indicate, your Honor, that I

14  initially mentioned to the Court that within the probation

15  report's recommendation, in addition to the calculation being

16  wrong, it had indicated that it had not considered what it

17  viewed as would potentially be reasons for variance, because it

18  didn't confirm the things that we all are considering with the

19  Court's actions were relating to, so that was one other thing

20  that is reflected in the probation report.

21          THE COURT:  You know, I've noted what I thought were

22  incorrect calculations by the probation department.  The

23  probation department recommendation is one factor that I take

24  into account, in addition to all of the other factors that I've

25  said.  So, I've taken all of that into account.

NBG3AZAS

1          MR. ZONE:  Okay, your Honor.

2          THE COURT:  Before I actually impose the sentence,

3    Mr. Azari, I'll recognize you for anything you wish to tell me.

4          THE DEFENDANT:  Yes, your Honor.  I had listened to

5    the victims.  The Daniel and the other two and the climate

6    subject.  I again regret.  Personally I wish I could expand on

7    it more on this subject.  There will come a day and I will be

8    able to do this.  I ask forgiveness.  You don't know

9    everything.  Thank you.

10         THE COURT:  All right.  Before I actually impose the

11   sentence, I'll recognize the government for anything the

12   government wishes to tell me.

13         MS. MURRAY:  The government has nothing further, your

14   Honor.

15         THE COURT:  Pursuant to the Sentencing Reform Act of

16   1984, it is the judgment of this Court that the defendant,

17   Aviram Azari, is hereby committed to the custody of the Bureau

18   of Prisons to be imprisoned for a term of 56 months on Counts

19   One and Three to run concurrently, to be followed by a term of

20   24 months on Count Four to run consecutively, for a total of 80

21   months' imprisonment.

22         I recommend that the Bureau of Prisons provide medical

23   care for the defendant for his physical conditions.

24         Upon release from imprisonment, the defendant shall be

25   placed on supervised release for a term of three years.  That

NBG3AZAS

1    is three years on Counts One and Three, and one year on Count

2    Four, all to run concurrently.

3            Within 72 hours of release from the custody of the

4    Bureau of Prisons, the defendant shall report in person to the

5    probation office in the district to which the defendant is

6    released.  While on supervised release, the defendant shall

7    comply with the mandatory, standard and special conditions of

8    supervised release on pages 21-23 of the presentence report.

9            The defendant shall not commit another federal, state

10   or local crime.  The defendant shall refrain from any unlawful

11   use or possession of a controlled substance.  The defendant

12   shall cooperate with the Immigration and Naturalization Service

13   and comply with all immigration laws.  The defendant must

14   cooperate in the collection of DNA as directed by the probation

15   officer.

16           The defendant shall submit his person, and any

17   property, residence, vehicle, papers, computer, other

18   electronic communications, data storage devices, cloud storage

19   or media and effects to a search by any United States probation

20   officer, and, if needed, with the assistance of any law

21   enforcement.  The search is to be conducted when there is

22   reasonable suspicion concerning violation of a condition of

23   supervision or unlawful conduct by the defendant.  Failure to

24   submit to a search may be grounds for revocation of release.

25   The defendant shall warn any other occupants that the premises

NBG3AZAS

1   may be subject to searches pursuant to this condition.  Any

2   search shall be conducted at a reasonable time and in a

3   reasonable manner.

4         The defendant must provide the probation officer with

5   access to any requested financial information.  The defendant

6   must not incur new credit charges or open additional lines of

7   credit without the approval of the probation officer unless the

8   defendant is in compliance with the installment payment

9   schedule.

10         As I've said, while on supervised release, the

11   defendant shall comply with the mandatory, standard, and

12   special conditions of supervised release on pages 21-23 of the

13   presentence report.  The defendant shall pay forfeiture in the

14   amount of $4,844,968.

15         It is further ordered that the defendant shall pay to

16   the United States a special assessment of $300, which shall be

17   due immediately.

18         I've already explained the reasons for the sentence.

19   Does either counsel know of any legal reason why the sentence

20   should not be imposed as I so stated it?

21         MS. MURRAY:  No, your Honor.

22         MR. ZONE:  No, your Honor.

23         THE COURT:  I will order the sentence to be imposed as

24   I've so stated it for all the reasons I've explained.

25         There is a waiver of the right to appeal the sentence,

NBG3AZAS

1     yes?

2              MS. MURRAY:  That's correct, your Honor.

3              THE COURT:  Does either counsel know of any legal

4     reason why the waiver is not effective?

5              MS. MURRAY:  I do not know of a reason, your Honor.

6              MR. ZONE:  No, your Honor.

7              THE COURT:  Okay.  Mr. Azari, the reason that I ask

8     these questions is that, generally, a defendant has the right

9     to appeal the sentence.  The notice of appeal must be filed

10    within 14 days after the entry of the judgment of conviction.

11    The judgment of conviction is entered promptly after the judge

12    announces the sentence.  If the defendant cannot pay the cost

13    of appeal, the defendant has the right to apply for leave to

14    appeal in forma pauperis.

15             If the defendant requests, the clerk will prepare and

16    file a notice of appeal on the defendant's behalf immediately,

17    and the rules require that a judge inform a defendant of this

18    right to appeal the sentence.

19             In this case, the parties advise that you have given

20    up or waived your right to appeal the sentence, and I'm

21    confident that when I took your guilty plea, I went over with

22    you the waiver of this right to appeal the sentence.  So it

23    appears that you have given up or waived your right to appeal

24    the sentence.  But I go over this with you now because I want

25    to make sure that you talk to your lawyers about this so that

NBG3AZAS

1    you're fully informed of all of your rights.

2             Do you understand what I've said?

3             THE DEFENDANT:  Yes, your Honor.

4             THE COURT:  All right.  Government moves to dismiss

5    all open counts?

6             MS. MURRAY:  Yes, your Honor.  We so move.

7             THE COURT:  And the defense agrees?

8             MR. ZONE:  Yes, your Honor.

9             THE COURT:  All open counts dismissed on the motion of

10   the government.

11            All right.  Again, I'll repeat what I said earlier.

12   If the defense wishes any intervention from the Court with

13   respect to the defendant's treatment, please, just write me a

14   letter.  All right.

15            MR. ZONE:  Your Honor, I don't know if you are going

16   to make a recommendation as to facility.

17            THE COURT:  If you wish, sure.

18            MR. ZONE:  I believe Devens in Massachusetts is a

19   higher level medical facility.

20            THE COURT:  Sure.  I recommend to the Bureau of

21   Prisons that the defendant be designated to FMC Fort Devens,

22   Massachusetts, or another facility capable of meeting the

23   defendant's physical needs.

24            Any other requests?

25            MR. ZONE:  That he just immediately receive medical

NBG3AZAS

1    treatment.

2              THE COURT:  I already said I'd recommend to the Bureau

3    of Prisons that the Bureau of Prisons provide medical care for

4    the defendant's physical condition.

5              MR. ZONE:  And if they're not complying, I'll write to

6    the Court.

7              THE COURT:  Yes, by all means.

8              MR. ZONE:  Thank you, your Honor.

9              THE COURT:  Okay.  I mean, as you know, it will take a

10   little while for the designation, so it's important that the

11   defendant receive whatever medical attention he needs while

12   still at the MDC.

13             MR. ZONE:  Yes, your Honor.

14             THE COURT:  Good afternoon, all.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25